UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:20-cv-00673-RJC-DCK

| | |
|---|---|
| PATRICIA NORCOM, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> NOVANT HEALTH, INC. ) <br> ) <br> Defendant. ) <br> ) <br> ) | **ORDER** |

**THIS MATTER** is before the Court on the Motion for Summary Judgment filed by Novant Health, Inc. (Doc. No. 27). Patricia Norcom, a certified registered nurse anesthetist ("CRNA"), was fired from Novant's South Park Surgery Center in 2020. Because she was fired after complaining about Novant's pandemic-era policy on paid time off ("PTO"), she claims that she was terminated for engaging in protected activity under the Fair Labor Standards Act ("FLSA"). *See* 29 U.S.C. § 215(a)(3) (prohibiting employers from retaliating against an employee because she filed a complaint related to the FLSA). Novant, however, claims that she was fired because she was chronically late for work, disputatious with a coworker, and dishonest in recording the times that she signed out the narcotics box that she used during surgeries.

Novant is entitled to summary judgment for three reasons. Most fundamentally, Norcom did not engage in any activity protected by the FLSA. Additionally, she has not shown that unlawful retaliation was the cause of her termination. Those two failures doom her prima facie case. And even if she could carry her prima facie burden, she still fails to show that Novant's legitimate, nonretaliatory reasons are pretexts. For these reasons, as elaborated below, Novant's Motion for Summary Judgment is **GRANTED**.

## I. BACKGROUND

### A. The Covid-Inspired Work Slowdown, and Norcom's Complaints About PTO

At the start of the Covid-19 pandemic, elective surgeries were suspended at the South Park Surgery Center. Norcom Dep. 58:13–22, Doc. No. 39; Vieceli Report 6, Doc. No. 27-11. That moratorium meant little work for CNRAs like Norcom. Norcom Dep. 58:13–22; Bott Decl. ¶ 3, Doc. No. 27-5. Responding to the work shortage, Novant gave its CRNAs time-off options: they could take a week off without pay or use their PTO. Bott Decl. ¶ 4.

Norcom complained about Novant's PTO policy three times: in an email to her supervisor, Julie Bott;[1] in a set of emails to Novant's compensation department; and in a formal HR inquiry. In the email to Bott, which Norcom sent on March 23, 2020, she asserted that, under "US Dept of Labor Rules," employees who are "exempt" are "not required to use [their] PTO due to [a] work slowdown." Ex. 7, Doc. No. 39 at 209. That email included a link to a fact sheet from the Department of Labor.[2] *Id.*

Norcom then sent a set of emails to Novant's compensation department on April 1, 2020. Ex. 10, Doc. No. 39 at 221–22. In those emails, she asked whether an "exempt employee" may be "forced to use PTO" to make up unworked hours. *Id.* at 222. She again referenced the DOL fact sheet. *Id.* A member of the compensation department explained that, under the DOL's guidelines, an employer can use an employee's PTO hours to pay her salary during a work slowdown. *Id.* at 221.

---

[1] Julie Bott was the Manager of Anesthesia Services. Bott Decl. ¶ 1, Doc. No. 27-5. She supervised CRNAs at multiple locations, including Norcom's surgery center. *Id.* ¶¶ 1–2.

[2] Norcom later testified that the meaning of the DOL fact sheet is "not clear" to her. Norcom Dep. 68:20, Doc. No. 39; *see also id.* 67:2–13, 68:14–22. Indeed, the fact sheet expressly states that employers *can* take the very action that Norcom was complaining about. *See* DOL Fact Sheet #70, Ex. 8, Doc. No. 39 at 218 ("An employer can substitute or reduce an exempt employee's accrued leave . . . for the time an employee is absent from work, even if it is less than a full day and even if the absence is directed by the employer because of lack of work . . . .").

2

In May 2020, Bott told Norcom that she would have to use her PTO to cover her unworked hours. Norcom Dep. 46:3–14. On May 12, 2020, Norcom submitted an HR inquiry that asked whether her supervisor could require that sort of PTO use. Ex. 12, Doc. No. 39 at 228–29. The inquiry mentioned that Norcom was exempt, but it did not reference the FLSA or the DOL fact sheet. *Id.* An HR representative told Norcom that she would not have to use any PTO for the days when she was sent home early after arriving at work. Norcom Dep. 43:8–20.

    **B.**    **Norcom's Tardiness, Inaccurate Recordkeeping, and Unprofessionalism**

Norcom's termination letter states that she was fired for three reasons: she was habitually late; she misrepresented her narcotics-box sign-out times; and she got into an inappropriately contentious altercation with one of her coworkers.[3] Ex. 18, Doc. No. 39 at 232–33.

During the year leading up to her termination, Norcom was repeatedly late for work. Performance and Behavior Documentation Form (Apr. 4, 2019), Ex. 4, Doc. No. 27-3 at 66; Norcom Dep. 89:6–25, 113:14–24, Doc. No. 39; Bott Dep. 61:2–6, 62:25–63:2; Gillespie Decl. ¶¶ 8, 14, Doc. No. 27-7. In 2019 and 2020, she was admonished multiple times for her tardiness. *Id.* For example, in a formal write-up filed on April 4, 2019, Norcom's then-supervisor reported that she "arrives late in the OR on a regular basis," so she is "unprepared" for the first surgery of the day. Performance and Behavior Documentation Form (Apr. 4, 2019), Ex. 4, Doc. No. 27-3 at 66. The supervisor told Norcom to "[p]lan to be at work at 6:45," and Norcom was warned that "[f]urther [t]ardiness will result in progressive discipline." *Id.* Closer to her termination, on May 20, 2020, Bott and Maureen Gillespie (the lead CRNA)[4] witnessed Norcom arrive late. Bott Dep. 69:4–5, 72:14–20; Gillespie Decl. ¶ 12. Norcom entered the CRNA workroom at 7:23 a.m. Bott

---

[3] Norcom's termination letter also states that she left work early without prior authorization. Ex. 18, Doc. No. 39 at 232–33. Novant does not rely on that reason in this litigation.

[4] As the lead CRNA at the surgery center, Gillespie acted as the CRNAs' on-site, day-to-day manager. Gillespie Decl. ¶ 4, Doc. No. 27-7.

3

Dep. 69:4–5, 72:14–20. She then wrote on a sign-out sheet that she had checked out her narcotics box at 7:15 a.m. Narcotics Box Records, Ex. 10, Doc. No. 27-3 at 80; Bott Dep. 73:12–20; Gillespie Decl. ¶ 13. She got to the OR at 7:33 a.m., three minutes after surgery was scheduled to begin. Bott Dep. 74:2–16.

Bott testified that it could be unsafe for a CRNA to hurry through—or skip—her pre-operation preparations. Bott Dep. 42:9–16, 44:20–24, 47:6–8; *see also id.* 62:6–8 ("I would call this a safety issue and a CRNA practice issue."). Before surgery, a CRNA must meet her patient, review the patient's history, check the anesthesia machine, prepare the drugs, and check the monitors. Bott Dep. 44:14–45:25; Gillespie Decl. ¶ 7. And before all that, the CRNA must change into scrubs, walk to the CRNA workroom, sign out a narcotics box, and ensure that the operating room is ready for surgery. Gillespie Decl. ¶ 7. All this must be done before surgery begins at 7:30 a.m. *Id.* Thus, CRNAs are expected to arrive at the surgery center between 6:30 and 6:45 a.m., though some arrive earlier. *Id.*

Norcom recorded inaccurate sign-out times on other days too. After an employee at the surgery center tracked Norcom's arrival times for several days,[5] Norcom's supervisors discovered that she was misrepresenting her narcotics-box sign-out times. She listed sign-out times that were earlier than her arrival time or within minutes of it:

| Date | Arrival Time | Narcotics-Box Sign-Out Time |
|---|---|---|
| May 21, 2020 | 6:53 a.m. | 6:55 a.m. |
| May 22, 2020 | 6:58 a.m. | 7:00 a.m. |
| May 26, 2020 | 7:01 a.m. | 7:00 a.m. |
| May 27, 2020 | 6:59 a.m. | 7:00 a.m. |
| May 28, 2020 | 6:36 a.m. | 6:40 a.m. |

---

[5] Bott and Gillespie instructed a Novant employee who went by the name "C" to record Norcom's arrival times. Bott Dep. 66:1–12; Gillespie Decl. ¶ 15. At the time, "C" was already taking employees' temperatures as part of the surgery center's anti-Covid measures. *Id.*

Narcotics Box Records, Ex. 10, Doc. No. 27-3 at 75–80; Handwritten Record of Arrival Times, Ex. 8, Doc. No. 27-3 at 74; Gillespie Decl. ¶ 13; Bott Dep. 69:4–5, 72:14–20, 73:12–23.

Gillespie explained that it is "not possible" to sign out a narcotics box "within mere minutes of arrival." Gillespie Decl. ¶ 16. That impossibility is due to "the time required to change into scrubs in the locker room and access the locked workroom where the narcotic boxes are maintained." *Id.* Norcom has not refuted that testimony. On the contrary, she concedes that her sign-out times were "[n]ot necessarily" accurate. Norcom Dep. 107:19, Doc. No. 39.

Finally, Norcom was "aggressive toward another team member." Termination Letter, Ex. 18, Doc. No. 39 at 232. On May 21, 2020, she "confronted" Gillespie, who was responsible for scheduling the CRNAs' shifts. Gillespie Decl. ¶¶ 4, 17, Doc. No. 27-7. Norcom was "angry that she was scheduled to stay late," and Gillespie said that she was "verbally attack[ed]" during the altercation. *Id.* ¶¶ 17–18. Norcom "yell[ed]" in "an angry and confrontational manner," Email from Gillespie to Bott, Ex. A, Doc. No. 27-7 at 7, raising her voice "to the point that other staff members came up to [Gillespie] afterward to make sure [she] was okay," Gillespie Decl. ¶ 18. Gillespie stated that Norcom's reaction made her "very uncomfortable," Gillespie Decl. ¶ 18, and Gillespie reported the incident to Bott, who investigated it, Bott Decl. ¶ 12, Doc. No. 27-5. Norcom sent Bott an email admitting that she was "guilty of becoming angry." Ex. 13, Doc. No. 39 at 231. She conceded that she had engaged in an "unprofessional interaction" with Gillespie, which she "regret[ted]." *Id.* At her deposition, Norcom said that she had communicated "in a nonproductive manner," and she acknowledged that she had not used a "calm" or "professional" tone. Norcom Dep. 84:19, 24, Doc. No. 39. A nurse who witnessed the incident described it as "highly inappropriate." Email from Anna Lescot to Bott, Doc. No. 27-8 at 13. She reported that some witnesses were "afraid it might come to blows." *Id.*

5

### C. Norcom's Termination and Suit

On May 22, 2020, the day after Norcom's outburst, Bott began talking with Todd Shumaker, the head of Novant's Charlotte-based employee-relations team. Shumaker Decl. ¶¶ 1–2, 4, Doc. No. 27-8. Shumaker and Debra Shaefer, Bott's supervisor, advised Bott on how to deal with Norcom's behavior. *Id.* ¶ 5–8; Schaefer Decl. ¶ 5–6, Doc. No. 27-6. After reviewing Norcom's behavioral issues, Shumaker "believed that termination was warranted." Shumaker Decl. ¶ 9. Shaefer agreed. Schaefer Decl. ¶ 7. Accordingly, on May 29, 2020, Bott fired Norcom. Termination Letter, Ex. 18, Doc. No. 39 at 232. Norcom's termination letter stated that she was fired because of her tardiness, sign-out misrepresentations, and altercation with Gillespie. *Id.*

On August 24, 2021, Norcom filed her Amended Complaint. Doc. No. 17. It asserts one claim: FLSA retaliation.

## II. STANDARD OF REVIEW

### A. Summary Judgment

A court will grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Ricci v. DeStefano*, 557 U.S. 557, 586 (2009) ("Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."). A fact is material only if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S.

6

317, 323 (1986) (internal quotation marks omitted). The moving party may carry its burden by showing "an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once this initial burden is met, the burden shifts to the nonmoving party. The nonmoving party must "set forth specific facts showing that there is a genuine issue for trial." *Id.* at 322 n.3. The nonmoving party may not rely on "the mere allegations or denials of [its] pleading" to defeat a motion for summary judgment. *Id.* Rather, the nonmoving party must present sufficient evidence from which "a reasonable jury could return a verdict" in its favor. *Anderson*, 477 U.S. at 248; *accord Sylvia Dev. Corp. v. Calvert County*, 48 F.3d 810, 818 (4th Cir. 1995).

When ruling on a summary-judgment motion, a court must view the evidence and any inferences from it in the light most favorable to the nonmoving party. *Sylvia*, 48 F.3d at 817. The mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. *Anderson*, 477 U.S. at 249. And if the nonmoving party's evidence is merely colorable, or is not significantly probative, summary judgment is appropriate. *Id.* at 249–50.

### III. DISCUSSION

#### A. Burden-Shifting Framework

The *McDonnell Douglas* framework governs FLSA-retaliation claims. *Darveau v. Detecon, Inc.*, 515 F.3d 334, 342 (4th Cir. 2008); *Reardon v. Herring*, 201 F. Supp. 3d 782, 784 n.2 (E.D. Va. 2016). To state a prima facie claim, an employee must show that (i) she engaged in activity protected by the FLSA; (ii) her employer took an adverse action against her; and (iii) there is a causal relationship between the protected activity and the adverse action. *Darveau*, 515 F.3d at 340.

If the employee states a prima facie claim, the burden shifts to the employer to "articulate a legitimate, non-retaliatory reason for the adverse employment action." *Anderson v. G.D.C., Inc.*, 281 F.3d 452, 458 (4th Cir. 2002). If the employer does so, the burden shifts back to the employee,

7

and she must show that the employer's asserted reason is a pretext for unlawful retaliation. *Id.*

Norcom did not engage in any activity protected by the FLSA, and she has not shown that unlawful retaliation was the cause of her termination. Therefore, she has failed to establish a prima facie case. And even if she could, she also failed to show that Novant's legitimate, nonretaliatory reasons are pretexts.

B. **Protected Activity Under the FLSA**

The FLSA requires employers to pay certain employees at least the federal minimum wage. 29 U.S.C. § 206. It also entitles some employees to overtime pay when they work over forty hours in a workweek. *Id.* § 207. But some employees are exempt from the FLSA's requirements. *Id.* § 213. Norcom admits that she is such an employee. *See* Am. Compl. ¶ 15, Doc. No. 17 ("At all relevant times, Norcom was a salaried, exempt employee within the meaning of the FLSA.").

The FLSA prohibits employers from discharging an employee because she filed a complaint "related to" the FLSA. 29 U.S.C. § 215(a)(3). For an employee's complaint to "fall within the scope of the antiretaliation provision," the complaint must be "sufficiently clear and detailed for a reasonable employer to understand it, in light of both content and context, as an assertion of rights protected by the statute and a call for their protection." *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 14 (2011); *see also Minor v. Bostwick Lab'ys, Inc.*, 669 F.3d 428, 432 (4th Cir. 2012); *Schmidt v. Bartech Grp., Inc.*, 119 F. Supp. 3d 374, 382 (E.D. Va. 2014) ("[W]hether a complaint constituted protected activity is determined from the objective perspective of the employer.").

A reasonable employer would not have thought that Norcom's complaints asserted any rights under the FLSA. Her complaints never mentioned a right protected by the statute. They mentioned her PTO hours, but the FLSA deals with minimum wages and overtime—not paid

8

vacations.[6] *See Kasten*, 563 U.S. at 4 ("The Fair Labor Standards Act of 1938 . . . sets forth employment rules concerning minimum wages, maximum hours, and overtime pay."); *Arjumand v. Laguardia Assocs., L.P.*, 2015 WL 1470470, at *5 (E.D.N.Y. Mar. 30, 2015) ("Under [the] FLSA, [e]mployees do not have a statutory entitlement to accrued vacation pay."); *Morke v. Archer Daniels Midland Co.*, 2010 WL 2403776, at *2 (W.D. Wisc. June 10, 2010) ("[P]laintiff's complaints about denial of vacation pay were not protected under the FLSA and no FLSA-based retaliation claim can arise from them.").[7]

The Middle District of Pennsylvania recently addressed this issue and reached the same conclusion. *See Eaton v. Commonwealth Health Sys., Inc.*, 2022 WL 4537878 (M.D. Pa. Sept. 28, 2022). There, a nurse case manager, who was exempt under the FLSA, brought an FLSA-retaliation claim against her former employer, a hospital. *Id.* at *1. She had complained when the hospital deducted her "accrued leave time" to make up for the "time off" that the hospital required her to take "at the outset of the COVID-19 pandemic." *Id.* After her termination, she claimed that her complaints constituted "protected activity under the FLSA." *Id.* at *4.

The Court ruled that the hospital's "leave-time deductions" could not "give rise to an objectively reasonable belief that it had violated the FLSA" because "the FLSA does not prohibit employers from docking accrued leave." *Id.* at *5–6. Though employers generally cannot "reduc[e] an [exempt] employee's fixed salary during periods of absence 'occasioned by the employer or by

---

[6] Norcom testified that her complaints had nothing to do with the amount of her compensation or any deductions from her salary. Norcom Dep. 80:11–16, Doc. No. 39. Rather, they concerned only the "use of vacation time." *Id.* 41:1; *see also id.* 40:19–42:11.

[7] *See also Waddell v. Mustang Eng'g, L.P.*, 2015 WL 5730765, at *5–6 (S.D. Tex. Sept. 30, 2015) (concluding that an employee's objections to the "interpretation of [a] PTO policy" are not protected by the FLSA); *Bergman v. Kids By the Bunch Too, Ltd.*, 2018 WL 1402249, at *8–9 (E.D.N.Y. Feb. 16, 2018) (stating that "complain[ing] about unpaid, accrued vacation days" is not "a protected activity under the FLSA"), *report and recommendation adopted by* 2018 WL 1401324 (E.D.N.Y. March 20, 2018).

9

the operating requirements of the business,'" *id.* at *4 (quoting 29 C.F.R. § 541.602(a)(2)), the FLSA "does not preclude employers from reducing exempt employees' accrued leave" because such "fringe benefits" are not part of an employee's "salary," *id.* at *5. After reviewing the "overwhelming weight" of authority holding that "the FLSA's salary-reduction prohibitions" do not apply to "fringe benefits such as paid leave," the Court concluded that "it is not objectively reasonable to believe that the Hospital's actions . . . contravened federal law." *Id.* at *5–6. Accordingly, it granted summary judgment to the hospital. *Id.* at *9.

*Eaton* explains why "[n]o reasonable employer could have believed that [Norcom's] complaint about using her paid leave account was a genuine assertion of rights under the FLSA." *Marcotte v. City of Rochester*, 677 F. App'x 723, 726 (2d Cir. 2017) (unpublished). What's more, Norcom was exempt under the FLSA when she made her complaints, so at that time she had no substantive rights to assert under the statute. *See Keith v. Univ. of Miami*, 437 F. Supp. 3d 1167, 1172 (S.D. Fla. 2020) ("Plaintiff as an exempt employee was not engaged in a statutorily protected activity and cannot maintain a claim under the FLSA."); *see also id.* at 1173 ("Plaintiff points to no case, and the Court has not on its own identified any, in which an employee clearly and explicitly exempted from FLSA coverage has successfully raised an FLSA retaliation claim."). A reasonable employer would know that too. *See id.* at 1173 ("Where, as here, Plaintiff was explicitly exempt and therefore not covered by the FLSA, the court concludes no reasonable employer, given the context and content, could have perceived her complaint as a genuine assertion of rights under the FLSA.").[8]

---

[8] At the summary-judgment hearing, Norcom claimed that Novant itself believed that she had engaged in protected activity under the FLSA. Hr'g Tr. 20:23–21:4 (Nov. 15, 2022) (real-time, unedited transcript). She based this assertion on the fact that, after she had submitted her HR inquiry, Novant returned her PTO without saying whether it did so because of company policy or because it thought that it had violated the FLSA by deducting it. *Id.* 25:8–17. Citing *Eaton*, *see id.*

10

In addition to *Kasten*'s reasonable-employer test, some courts apply a test focused on the objective reasonableness of the employee's subjective belief. *See, e.g.*, *Morrison v. Crabs on Deck, LLC*, 2018 WL 5113671, at *4–5 (D. Md. Oct. 19, 2018); *Eaton*, 2022 WL 4537878, at *4 ("[A] complaint will only trigger antiretaliatory safeguards if the plaintiff asserts it in subjective good-faith and with an objectively reasonable belief that her employer violated the law." (citing *Moore v. City of Philadelphia*, 461 F.3d 331, 341 (3d Cir. 2006))). Neither the Supreme Court nor the Fourth Circuit have required this test in FLSA cases. *Cf. Darveau v. Detecon, Inc.*, 515 F.3d 334, 341 (4th Cir. 2008) ("Assuming, without deciding, that a FLSA retaliation plaintiff must allege facts demonstrating that he had an objectively reasonable belief that his employer violated the FLSA, we believe that Darveau met this burden."). Whether it applies or not, Norcom fails it.

When Norcom complained about the PTO policy, she lacked a subjective belief that Novant was violating the FLSA. None of her complaints claimed that Novant had violated the FLSA. And while her pleadings profess a belief that she was fired "in retaliation for her complaints that Novant violated the FLSA," Am. Compl. ¶ 30, Doc. No. 17, her deposition testimony paints a different picture. She testified that she believes she was fired solely because she shared a

---

21:1–4, Norcom claims that she can satisfy the protected-activity prong of her prima facie case by showing that the alleged retaliation was "'based on the employer's mistaken belief' that the plaintiff engaged in [protected] activity, even if she did not," *Eaton*, 2022 WL 4537878, at *4 (quoting *Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 571 (3d Cir. 2002)). Even if such a mistaken belief could satisfy the protected-activity prong, Norcom "fails to adduce any evidence from which to infer that [Novant] ever understood her grievance to constitute protected activity." *Id.* at *6. Indeed, the compensation department was at pains to explain to Norcom that Novant was allowed to deduct her PTO under the DOL's rules. *See* HR Emails, Ex. 10, Doc. No. 39 at 221–22. And the HR representative who handled Norcom's inquiry stated that she "did not interpret [Norcom's] inquiry to raise any concerns under the Fair Labor Standards Act." Gonzalez Decl. ¶ 6, Doc. No. 27-4. Further, even if the HR representative did believe that Novant violated the FLSA, that representative did not fire Norcom. Bott did that, and there is no evidence that she thought that Novant violated the FLSA by deducting Norcom's PTO. *See Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021) (requiring "proof of a *decisionmaker's* knowledge of protected activity" (emphasis added)).

"protected communication" with Brittany Gonzalez, the HR representative who handled her HR inquiry. Norcom Dep. 40:17, Doc. No. 39; *see also id.* 41:4–11 (confirming that this was the "one and only reason"). And she did not believe that her communication was protected because of any provision in the FLSA. In fact, in explaining the basis of her claim during her deposition, Norcom never once mentioned the FLSA. Rather, she just generally thought that she could make her communication "freely without adverse action," *id.* 49:23, and her belief was based not on the FLSA but on an experience that her daughter had in the military.[9]

Even if Norcom had believed that Novant violated the FLSA, that belief would have been objectively unreasonable for multiple reasons. First, as explained by *Eaton*, it is objectively unreasonable to believe that the FLSA protects PTO. *See Eaton*, 2022 WL 4537878, at *6 (ruling that "the overwhelming weight" of authority holding that "the FLSA does not prohibit employers from docking accrued leave" made the plaintiff's complaint "objectively unreasonable"); *see also Keith*, 437 F. Supp. 3d at 1172 ("[I]t is presumed that the employee has substantive knowledge of the law . . . ."). Further, Norcom was exempt at the time of her complaints, and her exempt status was not being threatened. *See Schneider v. Scottsdale Unified Sch. Dist. No. 48*, 2022 WL 901418, at *7 (D. Ariz. Mar. 28, 2022) ("Plaintiff's exempt status precludes her from showing that she reasonably believed that Defendant's alleged conduct was unlawful."); *Estate of Roig v. United Parcel Serv., Inc.*, 2020 WL 6875790, at *19 n.34 (S.D. Fla. Sept. 30, 2020) ("[B]ecause Roig was clearly an exempt employee, any complaint he would have made about not receiving wages for

---

[9] Norcom explained that her "daughter was in the Air Force . . . and was in a similar situation where she made a protected communication and her immediate supervisor terminated her." Norcom Dep. 50:5–8, Doc. No. 39. Norcom "spoke extensively" with her daughter about that situation, and Norcom "learned a lot from her about the definition of protected communication, at least the military version of it." *Id.* 50:10–13. Norcom confirmed that she "got [her] definition" of "protected communication" from "conversations with [her] daughter." *Id.* 50:12, 14–16.

12

certain hours worked would not have been objectively reasonable and, thus, would not have qualified as protected activity."), *report and recommendation adopted by* 2020 WL 6873892 (S.D. Fla. Nov. 22, 2020). And, finally, the DOL fact sheet that served as the basis of Norcom's complaints specifically stated that Novant could do the very thing that Norcom believed it could not. *See* DOL Fact Sheet #70, Ex. 8, Doc. No. 39 at 218; *see also* Norcom Dep. 67:6–13 (failing to identify any part of the fact sheet that supports her complaints); *id.* 68:20 (testifying that she is "not clear" about the meaning of the DOL fact sheet). Thus, Norcom's complaints were objectively unreasonable.

### C. Causal Relationship

Norcom was fired less than three weeks after she filed her HR inquiry. According to her, this temporal proximity raises a causal inference. *See Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 348 (4th Cir. 2014) ("Temporal proximity between the protected activity and the adverse action is a significant factor in considering a circumstantial showing of causation . . . ."). But Novant argues that intervening events (Norcom's work infractions) undermine the temporal-proximity inference and lead to another one: that Norcom was fired for her misconduct. While an employee may use temporal proximity to circumstantially prove causation, "[t]he causal connection may be severed by . . . some legitimate intervening event." *Id.* And here, any causal connection was severed by Norcom's misconduct.

Norcom filed her last complaint, the HR inquiry, on May 12, 2020. Ex. 12, Doc. No. 39 at 228–29. A little over a week later, on May 20, Bott was visiting the surgery center when Gillespie informed her that Norcom was late again. Gillespie Decl. ¶ 10–11, Doc. No. 27-7. They both watched Norcom arrive late and misrepresent her narcotics-box sign-out time. Bott Dep. 69:4–5, 72:14–20, 73:12–20, Doc. No. 27-3; Gillespie Decl. ¶¶ 12–13. The day after that, Norcom instigated the altercation with Gillespie. Gillespie Decl. ¶¶ 17–18. And over the next week,

13

Norcom recorded several questionable narcotics-box sign-out times. Narcotics Box Records, Ex. 10, Doc. No. 27-3 at 75–80; Handwritten Record of Arrival Times, Ex. 8, Doc. No. 27-3 at 74; Gillespie Decl. ¶ 16. These intervening events, which occurred after Norcom's last complaint and before she was fired on May 29, severed any causal connection between her complaint and her termination. *See Barrick v. Pngi Charles Town Gaming, LLC*, 799 F. App'x 188, 189–90 (4th Cir. 2020) (affirming summary judgment where the employee's "violation of [the employer's] personal relationship policy" constituted a "legitimate intervening event that severed any causal connection between the reported activity and [the employee's] termination" (internal quotation marks omitted)).

Aside from temporal proximity, Norcom asserts that she experienced "multiple examples of retaliatory animus." Pl.'s Mem. Opp'n Summ. J. 20, Doc. No. 33. First, she argues that Bott singled her out. As an example, she says that Bott "responded with displeasure" to her first email about Novant's PTO policy. *Id.* at 21. Bott responded to Norcom with this email: "Questions come directly to me not the whole group. Never respond to all please and thank you. I will get clarification." Ex. 7, Doc. No. 39 at 213. But Norcom was not the only CRNA to receive this response. On March 23, Bott wrote to the entire CRNA email group in response to a complaint about the PTO policy from a different CRNA. In that email, she said: "All questions need to come to me only please." Doc. 27-5 at 29. She sent a virtually identical email to the whole group again on March 24 in response to a question about the PTO policy from yet another CRNA. *Id.* at 37. Since every CRNA received this message, it cannot be evidence of any retaliatory animus that Bott harbored against Norcom.

Norcom also argues that Bott singled her out by tracking her arrival times and sign-out times. But there is no evidence that Bott began investigating Norcom out of retaliatory animus.

14

Rather, the evidence shows that Bott started her investigation because of Norcom's habit of getting to work late. *See* Gillespie Decl. ¶ 14, Doc. No. 27-7 (stating that, the day before the tracking began, she "told Bott about Norcom's pattern of lateness because it was an ongoing problem that [she] ha[d] addressed with Norcom over the past year"). In 2019, Norcom was warned that "[f]urther [t]ardiness [would] result in progressive discipline." Performance and Behavior Documentation Form (Apr. 4, 2019), Ex. 4, Doc. No. 27-3 at 66. And after the surgery center reopened in early May 2020, Gillespie saw Norcom "fall back into old patterns of arriving late." Gillespie Decl. ¶¶ 8–9. Norcom was late again on May 20, when Bott was working at the surgery center. *Id.* ¶¶ 10–11. Since Bott was there, Gillespie decided to tell her about Norcom's tardiness. *Id.* at ¶ 11. Gillespie told Bott that she could go into the workroom where CRNAs sign out their narcotics boxes and watch Norcom arrive late for herself. *Id.* Bott did so, *id.* ¶ 12, and she concluded that Norcom's tardiness amounted to "a safety issue," Bott Dep. 62:7, Doc. No. 27-3. Norcom's "ongoing tardiness" prompted Gillespie and Bott to track and document Norcom's arrival times. Gillespie Decl. ¶ 15. When Gillespie reviewed the records, she discovered that Norcom was misrepresenting her narcotics-box sign-out times, and she told Bott. *Id.* ¶ 16. This chain of events shows that Bott and Gillespie focused on Norcom not out of retaliatory animus, but because of her questionable conduct.

In another attempt to infer retaliatory animus, Norcom points out that 96.77% of the narcotics-box sign-out times ended in either a five or a zero, and she insists that some of those times must be inaccurate. Pl.'s Mem. Opp'n Summ. J. 23, Doc. No. 33. Since she was the only CRNA who was disciplined for misrepresenting her sign-out times, she argues that she was treated worse than the other CRNAs, and she claims that this disparity stems from retaliatory animus. But her sign-out misrepresentations were not her only infractions. She also repeatedly arrived late and

15

got into a heated altercation with a coworker. Her termination letter stated that all these reasons—not only her sign-out discrepancies—led to her termination. Norcom Dep., Ex. 18, Doc. No. 39 at 232. Norcom does not argue that another CRNA committed all these infractions with impunity. Nor does she argue that another CRNA had a tardiness problem that merited supervision. Thus, the other CRNAs were not similarly situated to Norcom, *see Cowgill v. First Data Techs., Inc.*, 41 F.4th 370, 381–82 (4th Cir. 2022) ("[T]he plaintiff must provide evidence that the proposed comparators are not just similar in some respects, but similarly-situated in all respects." (quoting *Spencer v. Va. State Univ.*, 919 F.3d 199, 207 (4th Cir. 2019))), and their treatment cannot support an inference of retaliatory animus.

### D. Whether Novant's Asserted Reasons Are Actually Pretexts

Even if Norcom could establish a prima facie case, she would still need to show that Novant's legitimate, nondiscriminatory reasons are pretexts for unlawful retaliation. To make this showing, Norcom must prove "*both* that the reason[s] [were] false, *and* that discrimination was the real reason." *Jiminez v. Mary Washington Coll.*, 57 F.3d 369, 378 (4th Cir. 1995) (quoting *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993)) (alterations added).

Norcom offers no evidence that can prove these points. She does not dispute that she committed the workplace infractions identified by Novant. And she was not the only employee to complain about Novant's pandemic-era PTO policy. Multiple other CRNAs asked questions like hers. Bott Decl. ¶ 5, Doc. No. 27-5. Norcom herself confirmed that "lots of employees" raised concerns about the policy. Norcom Dep. 64:2–6, Doc. No. 39. And those CRNAs conveyed their concerns to the same supervisor: Julie Bott. Bott Decl. ¶¶ 5–6. But none of them were fired. *Id.* ¶ 6; *see Feldman v. Law Enf't Assocs. Corp.*, 752 F.3d 339, 349 (4th Cir. 2014) (affirming summary judgment where another employee engaged in the same protected activity and was not fired); *Barrick v. Pngi Charles Town Gaming, LLC*, 799 F. App'x 188, 190 (4th Cir. 2020) (same).

16

In short, Norcom offers no evidence that Novant lied about its reasons for firing her to cover up for illegal retaliation.

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that Novant's Motion for Summary Judgment (Doc. No. 27) is **GRANTED**. The Clerk is directed to close this case.

Signed: November 22, 2022

Robert J. Conrad, Jr.
United States District Judge